FILED
CLERK, U.S. DISTRICT COURT
10/20/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: GSA DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2026 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OLEG SERGEYEVICH DAVYDOV and LEE REIBER,<br><br>Defendants. | CR 2:26-cr-00664-JFW<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1956(h): Conspiracy to Engage in Money Laundering; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

I. The Defendants

1. Defendant OLEG SERGEYEVICH DAVYDOV, a citizen and resident of the Russian Federation ("Russia"), co-founded Oxygen Software, CJSC, a company later renamed MKO-Systems, LLC ("OXYGEN RUSSIA"), in 2000. He also co-founded Oxygen Forensics, Inc. ("OXYGEN US") in 2013 and was listed as OXYGEN US's Vice President and Secretary in U.S. corporate filings until approximately June 2022. Defendant DAVYDOV held the title of Chief Technology Officer ("CTO") and was

responsible for the development of digital forensics software sold by OXYGEN US (the "FORENSIC SOFTWARE"), used by law enforcement agencies to extract and analyze the contents of digital devices.

2. Defendant LEE REIBER, a U.S. citizen, served as OXYGEN US's Chief Operating Officer ("COO") beginning in or around August 2015. On or about March 30, 2022, defendant REIBER was named OXYGEN US's Chief Executive Officer ("CEO"), President, and Chairman of the Board in its corporate filings. Defendant REIBER managed OXYGEN US's day-to-day operations from his residence in Boise, Idaho.

II. Relevant Entities and Individuals

3. OXYGEN US was a corporation incorporated in the Commonwealth of Virginia in or around February 2013, with its principal place of business in Alexandria, Virginia. OXYGEN US was the primary distributor of the FORENSIC SOFTWARE outside Russia. OXYGEN US's customers included United States government agencies. Until on or about February 16, 2021, defendant DAVYDOV and Co-Conspirators 1 through 4, each of whom was a Russian citizen (collectively, the "RUSSIAN SHAREHOLDERS"), directly owned OXYGEN US.

4. Oxygen Forensics Ltd. ("OXYGEN CYPRUS") was a company incorporated under the laws of the Republic of Cyprus in or around January 2016. OXYGEN CYPRUS was originally named SaferWorld Forensics Ltd., and changed its name to Oxygen Forensics Ltd. in or around 2019. On or about February 16, 2021, the RUSSIAN SHAREHOLDERS transferred all their shares of OXYGEN US to OXYGEN CYPRUS, which thereafter wholly owned OXYGEN US. Co-Conspirator 5 was the director and majority shareholder of record of OXYGEN CYPRUS, and the RUSSIAN SHAREHOLDERS held its remaining shares.

5. OXYGEN RUSSIA was a company organized under the laws of Russia. OXYGEN RUSSIA was founded in 2000 as Oxygen Software, CJSC, and reorganized as Oxygen Software, LLC in or around 2015. The company changed its name to MKO-Systems, LLC in or around September 2022. The RUSSIAN SHAREHOLDERS owned and controlled OXYGEN RUSSIA. OXYGEN RUSSIA employed the software developers responsible for developing the FORENSIC SOFTWARE, which OXYGEN RUSSIA sold in Russia under different product names, including to the Russian Ministry of Internal Affairs ("MVD"), the Russian Federal Security Service ("FSB"), the Russian Federal Protective Service ("FSO"), the Russian Ministry of Justice, and the Russian Investigative Committee.

6. Co-Conspirator 1, a Russian citizen, co-founded OXYGEN RUSSIA with defendant DAVYDOV in 2000 and co-founded OXYGEN US in 2013. Co-Conspirator 1 was listed in OXYGEN US's corporate filings as its CEO, President, and Chairman of the Board until March 2022, and as a director of OXYGEN US until June 2022. Co-Conspirator 1 was responsible for corporate strategy, management, and international operations.

7. Co-Conspirator 2, a Russian citizen, held roles at OXYGEN RUSSIA beginning no later than approximately June 2013. Co-Conspirator 2 served as OXYGEN RUSSIA's Marketing Director and, until approximately June 2022, was listed as the Chief Marketing Officer of OXYGEN US.

8. Co-Conspirator 3, a Russian citizen, held roles at OXYGEN RUSSIA beginning no later than approximately 2002. Russian business records listed Co-Conspirator 3 as a former Director of OXYGEN RUSSIA. Co-Conspirator 3 focused on corporate strategy and development of the FORENSIC SOFTWARE.

9. Co-Conspirator 4, a Russian citizen, held roles at OXYGEN RUSSIA beginning no later than approximately 2002. Co-Conspirator 4 handled invoices between OXYGEN US and OXYGEN CYPRUS, managed contracts with outside vendors, and worked on the team that developed the FORENSIC SOFTWARE.

10. Co-Conspirator 5, a Russian citizen, served as the nominal director of OXYGEN CYPRUS. Beginning no later than approximately 2013, Co-Conspirator 5 managed customer support for OXYGEN RUSSIA and OXYGEN US. In or around 2016, Co-Conspirator 5 relocated from Russia to Cyprus, and registered the company that became OXYGEN CYPRUS.

## III. The U.S. Government Customers

11. OXYGEN US marketed and sold the FORENSIC SOFTWARE to the U.S. Department of Defense ("DOD") and U.S. law enforcement agencies, including the U.S. Secret Service ("Secret Service") and its National Computer Forensics Institute ("NCFI"), Homeland Security Investigations ("HSI"), the Department of Homeland Security Office of Inspector General ("DHS OIG"), and the Internal Revenue Service, Criminal Investigation ("IRS-CI"). The DOD, Secret Service, HSI, DHS OIG, and IRS-CI are collectively referred to herein as the "U.S. GOVERNMENT CUSTOMERS."

## IV. Government Contracting Certifications

12. In seeking and performing contracts with U.S. government agencies, OXYGEN US made certifications and representations concerning, among other things, its ownership and control, and the origin and development of the FORENSIC SOFTWARE. The requirements governing those certifications and representations included, but were not limited to, the following:

a. OXYGEN US maintained a registration in the System for Award Management ("SAM"), through which it submitted Representations and Certifications to compete for and be awarded contracts with U.S. government agencies. The Representations and Certifications included a section titled "Ownership or Control of Offeror." That section required the company to state whether it had an "immediate owner" and, if so, to identify that owner and state whether it was owned or controlled by another entity. The form defined an immediate owner as "an entity, other than the offeror, that has direct control of the offeror." Each submission included a certification in which the submitter attested "to the accuracy of the representations and certifications contained herein" and stated that he understood he "may be subject to criminal prosecution under Section 1001, Title 18 of the United States Code."

b. A DOD contracting office (the "DOD Procurement Office") entered into credit card agreements that allowed authorized government personnel to purchase a vendor's products using government purchase cards. The DOD Procurement Office required offerors that did not hold a DOD facility security clearance and had not submitted the form to that office within the preceding year, to complete and submit an SF-328 Certificate Pertaining to Foreign Interests ("SF-328"). In the provision imposing that requirement, the DOD Procurement Office defined a foreign interest or person to include a business entity organized under the laws of a country other than the United States, an individual who was not a U.S. citizen, and a U.S. business owned, controlled, or influenced by either. The provision also instructed that foreign ownership be reported by country, including indirect ownership through intermediate subsidiaries.

c. The SF-328 submitted by OXYGEN US to the DOD Procurement Office asked a series of questions about foreign ownership, control, and influence, each to be answered "Yes" or "No," and required complete supporting documentation for any "Yes" answer. The form warned that 18 U.S.C. § 1001 made it a criminal offense to knowingly make false statements, including "any statement made herein which is knowingly incorrect, incomplete, or misleading in any important particular." The person signing the form certified that the entries were "true, complete, and correct to the best of my knowledge and belief."

d. The DOD Procurement Office's agreement also required a contractor to notify the contracting officer, in writing, when it submitted its offer and at any time thereafter, if any software to be delivered was of foreign origin, and to identify the foreign source. The agreement defined foreign-origin software to include software that was developed, maintained, or modified, to any degree, outside the United States, or inside the United States by an individual who was not a U.S. citizen.

V. Overview of the Criminal Scheme

13. Beginning no later than in or around March 2022, and continuing through on or about September 20, 2026, defendants DAVYDOV and REIBER and their co-conspirators obtained and sought to obtain contracts, renewals, and payments from the DOD and U.S. law enforcement agencies, including the U.S. GOVERNMENT CUSTOMERS, for the FORENSIC SOFTWARE, and related products and services, by means of materially false and misleading statements and the concealment of material facts. Specifically, defendants DAVYDOV and REIBER and their co-conspirators misrepresented that OXYGEN US was an

independent U.S. company free of foreign ownership, control, and influence, and that the FORENSIC SOFTWARE was developed in the United States and not in Russia. They also concealed from the U.S. GOVERNMENT CUSTOMERS that the FORENSIC SOFTWARE was of foreign origin. Defendants DAVYDOV and REIBER and their co-conspirators knew that, had the U.S. GOVERNMENT CUSTOMERS known the true facts, the U.S. GOVERNMENT CUSTOMERS would not have contracted with OXYGEN US and would not have acquired or used the FORENSIC SOFTWARE or related products and services.

A. Concealment of the RUSSIAN SHAREHOLDERS' Ownership and Control of OXYGEN US

14. On or about February 24, 2022, Russia launched a full-scale invasion of Ukraine, resulting in expanded U.S. sanctions against Russia and greater scrutiny of business conducted with entities or individuals located in Russia, or with entities or individuals who also conducted business with the Russian government.

15. Following Russia's invasion of Ukraine, defendants DAVYDOV and REIBER and their co-conspirators took steps to conceal that the RUSSIAN SHAREHOLDERS owned and controlled OXYGEN US and that the FORENSIC SOFTWARE was developed in Russia. These steps included, but were not limited to, the following:

a. On or about March 30, 2022, defendant DAVYDOV and Co-Conspirator 1, who were listed as OXYGEN US's only directors in OXYGEN US's February 2021 and January 2022 annual reports, caused defendant REIBER, then OXYGEN US's Chief Operating Officer, to be named the CEO, President, and Chairman of the Board of OXYGEN US. An amended annual report reflecting those changes, bearing defendant REIBER's name as the signatory, was filed by OXYGEN US with the

Virginia State Corporation Commission. The amended report also replaced the Russian addresses previously listed for defendant DAVYDOV, Co-Conspirator 1, and Co-Conspirator 2 with the address of OXYGEN US's office in Alexandria, Virginia. The amended report continued to list defendant DAVYDOV and Co-Conspirator 1 as directors, and defendant DAVYDOV as Vice President and Secretary.

b. On or about June 7, 2022, defendant DAVYDOV and Co-Conspirator 1 caused OXYGEN US's corporate filings to be amended again. An amended annual report, bearing defendant REIBER's name as the signatory, removed defendant DAVYDOV and Co-Conspirator 1 as officers and directors of OXYGEN US and removed Co-Conspirator 2 as an officer. The report listed an individual whose identity is known to the Grand Jury as Vice President, Secretary, and a director, and Co-Conspirator 5 as a director, each at OXYGEN US's Alexandria address.

c. In or around September 2022, defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS caused OXYGEN RUSSIA to change its name from Oxygen Software, LLC to MKO-Systems, LLC. OXYGEN RUSSIA also changed the names under which the FORENSIC SOFTWARE was sold to customers in Russia, including the Russian government, such that "Oxygen" was no longer in the product names.

d. In or around August 2022 and December 2022, defendants DAVYDOV and REIBER and their co-conspirators caused OXYGEN US to tell its European sales representatives and partners that its Russian founders were "not owners or beneficiaries" of OXYGEN US.

e. In or around February 2024, after a reseller reported that government purchasers in Sweden and Denmark would not buy from a company with developers in Russia, defendant REIBER revised a

statement to be shared with European customers by deleting the statements that its founders were Russian and that it used developers in Russia, while retaining the statement that "[a]ll compilation, coordination, code review, software build and deployment to customers is completed in Virginia, USA."

f. Defendants DAVYDOV and REIBER and their co-conspirators represented to DOD and various law enforcement agencies, both in the United States and abroad, that OXYGEN US was an independent U.S. company without Russian owners or beneficiaries. For example, in or around May 2024 and November 2024, defendant REIBER signed declarations for Swedish and Danish government purchasers, and for a reseller that sold to them, representing that OXYGEN US was not an entity covered by European Union sanctions against Russia, a category that included companies majority owned, directly or indirectly, by Russian citizens.

g. Beginning in or around April 2024, Co-Conspirator 1 was reinstated to OXYGEN US's board of directors under a Turkish alias rather than Co-Conspirator 1's true Russian name and identity. Defendant REIBER added Co-Conspirator 1 as a signatory on OXYGEN US's bank accounts in or around October 2024. Beginning in or around November 2024, Co-Conspirator 1 became OXYGEN US's President and Chairman of the Board under Co-Conspirator 1's Turkish alias.

16. Despite these changes to OXYGEN US's corporate filings, defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS continued to oversee defendant REIBER and control OXYGEN US. Among other things, they set defendant REIBER's compensation, including by freezing his salary in or around April 2024 until OXYGEN US paid amounts that OXYGEN CYPRUS claimed it was owed; overruled defendant REIBER on

payments related to OXYGEN US; demanded and obtained administrative access to OXYGEN US's payroll system over defendant REIBER's objection; and held signature authority over OXYGEN US's bank accounts.

17. Throughout this period, defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS continued to own OXYGEN US through OXYGEN CYPRUS. Although Co-Conspirator 5 was OXYGEN CYPRUS's director and majority shareholder of record, the RUSSIAN SHAREHOLDERS controlled OXYGEN CYPRUS through two agreements entered into on or about February 16, 2021, the same day they transferred their OXYGEN US shares to OXYGEN CYPRUS. A shareholder agreement gave the RUSSIAN SHAREHOLDERS the power to veto major decisions by OXYGEN CYPRUS and its subsidiaries, including OXYGEN US. An option agreement granted the RUSSIAN SHAREHOLDERS the right to purchase nearly all of Co-Conspirator 5's shares of OXYGEN CYPRUS for a nominal price. The shareholder agreement provided that its terms were confidential and would not be reflected in OXYGEN CYPRUS's articles of association.

B. False and Misleading Statements to the U.S. GOVERNMENT CUSTOMERS

18. From on or about September 11 through September 13, 2023, OXYGEN US sponsored and staffed a booth at a digital forensics conference at the Pasadena Convention Center in Pasadena, California. Defendant REIBER, who had signed OXYGEN US's sponsorship contract, attended the conference, as did OXYGEN US sales personnel. At the booth, OXYGEN US sales personnel presented OXYGEN US to prospective customers, including federal law enforcement representatives, as a U.S. software development company.

19. The false and misleading certifications and representations that defendants DAVYDOV and REIBER and their co-conspirators made, and caused OXYGEN US to make, to U.S. government agencies, and the material facts they concealed, included, but were not limited to, the following:

a. In SAM Representations and Certifications submitted on or about August 19, 2022, December 26, 2022, and October 27, 2023, defendant REIBER and his co-conspirators caused OXYGEN US to represent falsely that it did not have an immediate owner. Defendant REIBER personally certified the December 2022 and October 2023 submissions. As defendants DAVYDOV and REIBER and their co-conspirators then knew, OXYGEN CYPRUS wholly owned OXYGEN US, and the RUSSIAN SHAREHOLDERS owned and controlled OXYGEN CYPRUS.

b. In or around July 2024, OXYGEN US sought a Credit Card Agreement with the DOD Procurement Office. On or about July 17, 2024, an OXYGEN US employee whose identity is known to the Grand Jury, who was then OXYGEN US's Director of Operations ("Employee 1"), sent defendant REIBER for review, before signing, the contract documents, including an SF-328 that Employee 1 had prepared. Defendant REIBER replied, "Looks good," and did not correct any of the answers. On or about July 19, 2024, Employee 1 signed the SF-328 on OXYGEN US's behalf, and defendant REIBER caused OXYGEN US to submit it to the DOD Procurement Office. On or about July 24, 2024, the DOD Procurement Office entered into the Credit Card Agreement with OXYGEN US. The SF-328 that OXYGEN US submitted contained the following false and misleading answers, among others:

i. Question 1(a) asked whether "any foreign person(s), directly or indirectly, own or have beneficial ownership

of 5 percent or more of the outstanding shares of any class of your organization's equity securities." OXYGEN US marked the question as not applicable. In truth, OXYGEN CYPRUS, a foreign entity, owned all of OXYGEN US's shares, and the RUSSIAN SHAREHOLDERS owned OXYGEN US indirectly through OXYGEN CYPRUS.

ii. Question 3 asked whether "any non-U.S. citizens serve as members of your organization's board of directors (or similar governing body), officers, executive personnel, . . . or senior management officials." OXYGEN US answered "No." In truth, in or around April 2024, Co-Conspirator 1, a Russian citizen, had returned to OXYGEN US's board of directors under a Turkish alias. In addition, defendant DAVYDOV, a Russian citizen, directed the development of the FORENSIC SOFTWARE, including deciding whether OXYGEN US could obtain security testing. Co-Conspirator 1 directed defendant REIBER's work and set his compensation. Co-Conspirator 2, a Russian citizen, directed OXYGEN US's marketing and its payment of expenses.

iii. Question 4 asked whether "any foreign person(s) have the power, direct or indirect, to control the election, appointment, or tenure of members of your organization's board of directors . . . or other management positions of your organization, or have the power to control or cause the direction of other decisions or activities of your organization." OXYGEN US answered "No." In truth, the RUSSIAN SHAREHOLDERS had the power to control the election, appointment, and tenure of OXYGEN US's directors and managers, and to control and cause the direction of its decisions and activities.

iv. Question 5 asked whether OXYGEN US had "any contracts, agreements, understandings, or arrangements with a foreign person(s)." OXYGEN US answered "No." In truth, OXYGEN US had agreements and arrangements with OXYGEN CYPRUS, including an arrangement under which OXYGEN US paid OXYGEN CYPRUS royalties and licensing fees.

v. Question 10 asked, "Is there any other factor(s) that indicates or demonstrates a capability on the part of foreign persons to control or influence the operations or management of your organization?" OXYGEN US answered "No." In truth, the RUSSIAN SHAREHOLDERS had the capability to control and influence the operations and management of OXYGEN US.

c. In seeking and obtaining the Credit Card Agreement, defendant REIBER caused OXYGEN US to agree to notify the contracting officer for the DOD Procurement Office if any software to be delivered was developed to any degree outside the United States, while knowing that the FORENSIC SOFTWARE was developed outside the United States and intending not to provide the required notice, which OXYGEN US never provided.

C. False Statements Following Public Reporting in 2026

20. In or around February 2026, reports published online and in international news outlets alleged that OXYGEN US was owned by entities associated with the Russian government. On or about February 24, 2026, NCFI contracting personnel emailed OXYGEN US employees to discuss the allegations. On or about February 25, 2026, Employee 1 responded by email, copying defendant REIBER, denying the allegations. Employee 1 stated that OXYGEN US's stock was owned by OXYGEN CYPRUS, that OXYGEN US was not owned or controlled by any

Russian entity, that it operated independently under U.S. leadership, and that no member of its software development team was based in Russia. In truth, as defendant REIBER then knew, OXYGEN US was owned and controlled by the RUSSIAN SHAREHOLDERS, and the FORENSIC SOFTWARE was developed by a software development team led by defendant DAVYDOV in Russia.

21. On or about March 6, 2026, defendant REIBER, from McCall, Idaho, together with Employee 1, conducted an audio-video call with a DHS contracting officer representative located in Irvine, California, and federal agents also located in the Central District of California and elsewhere, to follow up on the email exchange with NCFI described in paragraph 20. During the call, defendant REIBER denied that any Russian citizen or any person located in Russia held any ownership interest in OXYGEN US; denied that any Russian citizen or any person located in Russia had any control over OXYGEN US; denied that any Russian citizen or any person located in Russia was involved in developing the FORENSIC SOFTWARE or had access to the environment in which the FORENSIC SOFTWARE was developed; and stated that each of those denials had been true since he became CEO of OXYGEN US in 2022. Defendant REIBER further stated that OXYGEN CYPRUS was controlled by a resident of Cyprus, and that no one in Russia held stock in OXYGEN CYPRUS. In truth, as defendant REIBER then knew, the RUSSIAN SHAREHOLDERS owned and controlled OXYGEN US; defendant DAVYDOV, Co-Conspirators 3 and 4, and others in Russia developed the FORENSIC SOFTWARE and had access to the environment in which it was developed; and the RUSSIAN SHAREHOLDERS owned and controlled OXYGEN CYPRUS, including through their direction of Co-Conspirator 5.

22. On an unknown date, but no later than on or about April 18, 2026, defendant REIBER caused OXYGEN US to publish a document titled "Company Statement on Operations and Governance," which he had drafted, on the website "trust.oxygenforensics.com," which was accessible within the Central District of California and elsewhere. The document stated that OXYGEN US "does not conduct business in restricted jurisdictions and is not owned or controlled by entities in such regions. The company operates independently under its U.S. leadership structure, with operational and customer-facing functions managed from the United States." The document further stated that OXYGEN US "does not maintain development or operational presence in restricted jurisdictions." In truth, as defendant REIBER then knew, OXYGEN US was owned and controlled by the RUSSIAN SHAREHOLDERS, and the FORENSIC SOFTWARE was developed by a software development team led by defendant DAVYDOV in Russia. This document was accessed and downloaded within the Central District of California, including by a contract specialist with the Internal Revenue Service in Lake Forest, California, on or about May 5, 2026, and by a supervisory agent with HSI's Computer Forensics Group, on or about September 17, 2026, in Long Beach, California.

D. Transfer of OXYGEN US's Revenue to the RUSSIAN SHAREHOLDERS through OXYGEN CYPRUS

23. OXYGEN US received payments from the U.S. GOVERNMENT CUSTOMERS for the FORENSIC SOFTWARE into its bank accounts in the United States. Defendants DAVYDOV and REIBER and their co-conspirators caused OXYGEN US to transfer approximately half of OXYGEN US's sales revenue, including revenue obtained from the U.S. GOVERNMENT CUSTOMERS through the fraudulent scheme described above,

from OXYGEN US's bank accounts in the United States to accounts held by OXYGEN CYPRUS outside the United States. The transfers were made under invoices that Co-Conspirator 5 issued from OXYGEN CYPRUS, which characterized the payments as royalties and licensing fees owed to OXYGEN CYPRUS. Between in or around June 2022 and in or around August 2026, OXYGEN US made at least 189 such transfers, totaling more than $25 million.

24. Defendants DAVYDOV and REIBER and their co-conspirators structured and described the transfers in this way in part to conceal that OXYGEN US's revenue was being paid to the RUSSIAN SHAREHOLDERS. Once the funds reached OXYGEN CYPRUS, defendant DAVYDOV, the other RUSSIAN SHAREHOLDERS, and Co-Conspirator 5 caused OXYGEN CYPRUS to use the funds to pay defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS under consulting and development agreements rather than as distributions to owners. Beginning in or around February 2023, defendant REIBER also stopped OXYGEN US's direct reimbursement of expenses that Co-Conspirators 1 and 2 had incurred, including in Russia, and directed that those expenses be paid through company cards or by OXYGEN CYPRUS, so that OXYGEN US's records would no longer show reimbursements to individuals in Russia.

25. Defendants DAVYDOV and REIBER and their co-conspirators also caused OXYGEN US to transfer funds to OXYGEN CYPRUS to pay for, among other things, the compensation of the software developers in Russia who, under defendant DAVYDOV's direction, continued to develop the FORENSIC SOFTWARE. This allowed OXYGEN US to continue selling the FORENSIC SOFTWARE and related products and services to the U.S. GOVERNMENT CUSTOMERS without disclosing that the FORENSIC SOFTWARE was developed in Russia.

COUNT ONE

[18 U.S.C. § 1349]

[ALL DEFENDANTS]

26. The Grand Jury realleges and incorporates paragraphs 1 through 25 of this Indictment here.

I. OBJECT OF THE CONSPIRACY

27. Beginning on an unknown date, but no later than in or around March 2022, and continuing through on or about September 20, 2026, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants OLEG SERGEYEVICH DAVYDOV and LEE REIBER knowingly conspired with each other, and with others known and unknown to the Grand Jury, to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

II. MANNER AND MEANS OF THE CONSPIRACY

28. The object of the conspiracy was to be carried out, and was carried out, in substance, as follows:

a. Following Russia's invasion of Ukraine, defendants DAVYDOV and REIBER, and others known and unknown to the Grand Jury, would remove or conceal information that identified the RUSSIAN SHAREHOLDERS as officers, directors, or owners of OXYGEN US, or that connected OXYGEN US to OXYGEN RUSSIA.

b. Defendants DAVYDOV and REIBER, and others known and unknown to the Grand Jury, would cause OXYGEN US to amend its corporate filings to remove indicia that its officers and directors resided in Russia and that OXYGEN US shared its leadership with OXYGEN RUSSIA.

c. Defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS would install in their place, and maintain control over, persons who

held officer and director positions at OXYGEN US and OXYGEN CYPRUS, including defendant REIBER and Co-Conspirator 5.

d. Despite the changes to OXYGEN US's corporate filings, defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS would continue to own and control OXYGEN US, including through their ownership and control of OXYGEN CYPRUS.

e. Defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS would continue to direct OXYGEN US's management, finances, and operations, including through defendant REIBER.

f. Defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS would conceal that they were directing OXYGEN US's operations from Russia, including by masking the locations from which they accessed OXYGEN US's systems.

g. Defendant DAVYDOV would continue to lead the development of the FORENSIC SOFTWARE by a team that he and other RUSSIAN SHAREHOLDERS managed principally from Russia.

h. Defendants DAVYDOV and REIBER, and others known and unknown to the Grand Jury, would take steps to conceal that the FORENSIC SOFTWARE was developed in Russia, including by masking the locations from which the development team accessed the environment in which the FORENSIC SOFTWARE was built and removing indications of Russian development from the FORENSIC SOFTWARE sold outside Russia.

i. Defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS would conceal their ownership and control of OXYGEN CYPRUS, through which they owned OXYGEN US, including by (i) acting through Co-Conspirator 5 as OXYGEN CYPRUS's majority shareholder of record and nominal director; (ii) exercising control over OXYGEN CYPRUS through confidential shareholder and option agreements; and (iii) using

consulting and development agreements and other means to receive funds from OXYGEN CYPRUS.

j. Defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS would conceal the connection between OXYGEN US and OXYGEN RUSSIA, including by renaming OXYGEN RUSSIA and the forensic software products it sold in Russia, separating the two companies' online presence, and concealing their common ownership and control of both OXYGEN RUSSIA and OXYGEN US.

k. Co-Conspirator 1 would return to OXYGEN US as an officer and director, and as a signatory on its bank accounts, under a Turkish alias rather than his true Russian name and identity.

l. Defendant REIBER, Co-Conspirator 2, and others known and unknown to the Grand Jury would market, and would cause OXYGEN US to market, the FORENSIC SOFTWARE as the product of a trusted, independent U.S. company.

m. Defendant REIBER, and others known and unknown to the Grand Jury, would make, and cause OXYGEN US employees to make, false and misleading representations to U.S. government agencies and their resellers concerning the ownership and control of OXYGEN US.

n. Defendant REIBER, and others known and unknown to the Grand Jury, would make, and cause OXYGEN US employees to make, false and misleading representations to U.S. government agencies, their resellers, and other customers concerning the development of the FORENSIC SOFTWARE.

o. When the U.S. GOVERNMENT CUSTOMERS and others raised questions about OXYGEN US's connections to Russia, defendant REIBER would consult with defendant DAVYDOV and the other RUSSIAN SHAREHOLDERS about how to respond.

p. In response to those questions, and to convince and attempt to convince the U.S. GOVERNMENT CUSTOMERS to purchase and to continue purchasing and renewing the FORENSIC SOFTWARE, defendant REIBER and others known and unknown to the Grand Jury would make, and would cause OXYGEN US employees to make, false and misleading statements concerning the RUSSIAN SHAREHOLDERS' ownership and control of OXYGEN US and the facts and circumstances concerning the development of the FORENSIC SOFTWARE, including in emails, calls, and publications on OXYGEN US's website.

q. Defendant REIBER would cause OXYGEN US to transfer sales revenues, including revenue from sales to the U.S. GOVERNMENT CUSTOMERS, to OXYGEN CYPRUS, for the benefit of the RUSSIAN SHAREHOLDERS.

r. Defendants DAVYDOV and REIBER, and others known and unknown to the Grand Jury, would use interstate and foreign wire communications in furtherance of the conspiracy.

COUNTS TWO AND THREE

[18 U.S.C. §§ 1343, 2(a), (b)]

[ALL DEFENDANTS]

29. The Grand Jury realleges and incorporates paragraphs 1 through 25 of this Indictment here.

I. THE SCHEME TO DEFRAUD

30. Beginning on an unknown date, but no later than in or around March 2022, and continuing through on or about September 20, 2026, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants OLEG SERGEYEVICH DAVYDOV and LEE REIBER, and others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud the DOD and U.S. law enforcement agencies, including the U.S. GOVERNMENT CUSTOMERS, as to material matters, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

31. The scheme to defraud operated, in substance, as described in paragraph 28 of this Indictment, which is realleged and incorporated here.

II. USE OF INTERSTATE WIRES

32. On or about the dates set forth below, within the Central District of California, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendants DAVYDOV and REIBER, and others known and unknown to the Grand Jury, transmitted and caused the transmission of the following items by means of wire communication in interstate commerce:

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| TWO | 3/6/2026 | Statements on an audio-video call by defendant REIBER from McCall, Idaho, to a DHS contracting officer representative in Irvine, California, and others, denying, among other things, that any Russian citizen or any person located in Russia held any ownership interest in OXYGEN US; denying that any Russian citizen or any person located in Russia had any control over OXYGEN US; and denying that any Russian citizen or any person located in Russia was involved in developing the FORENSIC SOFTWARE or had access to the environment in which the FORENSIC SOFTWARE was developed. |
| THREE | 5/5/2026 | Transmission of a document titled “Company Statement on Operations and Governance,” which defendant REIBER had caused OXYGEN US to publish on the website “trust.oxygenforensics.com,” from that website to an IRS contract specialist in Lake Forest, California, which stated, among other things, that OXYGEN US “does not conduct business in restricted jurisdictions and is not owned or controlled by entities in such regions” and that “[t]he company operates independently under its U.S. leadership structure, with operational and customer-facing functions managed from the United States.” |

COUNT FOUR

[18 U.S.C. § 1956(h)]

[ALL DEFENDANTS]

33. The Grand Jury realleges and incorporates paragraphs 1 through 25 and 28 of this Indictment here.

34. Beginning on an unknown date, but no later than in or around March 2022, and continuing through on or about September 20, 2026, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants OLEG SERGEYEVICH DAVYDOV and LEE REIBER knowingly conspired with each other and with others known and unknown to the Grand Jury to:

a. Transport, transmit, and transfer, and attempt to transport, transmit, and transfer, funds from a place in the United States to and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity -- namely, wire fraud, in violation of Title 18, United States Code, Section 1343, including as charged in Counts Two and Three of this Indictment -- in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

b. Transport, transmit, and transfer, and attempt to transport, transmit, and transfer, funds from a place in the United States to and through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity -- namely, wire fraud, in violation of Title 18, United States Code, Section 1343, including as charged in Counts Two and Three of this Indictment -- and knowing that such transportation, transmission, and transfer were designed in whole and in part to conceal and disguise the

nature, the location, the source, the ownership, and the control of the proceeds of said unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts One through Three of this Indictment.

2. Any defendant so convicted shall forfeit to the United States the following:

a. All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

b. To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(1)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction of the offenses set forth in Count Four of this Indictment.

2. Any defendant so convicted shall forfeit to the United States the following:

a. Any property, real or personal, involved in such offense, and any property traceable to such property; and

b. To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property, if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the

course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000 or more in any twelve-month period.

A TRUE BILL

/S/

Foreperson

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

DAVID C. LACHMAN
Assistant United States Attorney
Major Frauds Section

JOSHUA O. MAUSNER
Assistant United States Attorney
National Security Division